## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal Action No. 2022-0003** |
| **SEBASTIAN SOOGRIM,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ————————————————————— | ) | |

**Attorneys:**
**Evan Rikhye, Esq.,**
St. Croix, U.S.V.I.
   *For the United States*

**Lisa L. Brown Williams, Esq.,**
St. Croix, U.S.V.I.
   *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Sebastian Soogrim's Motion to Suppress (Dkt. No. 44); the Government's Response (Dkt. No. 46); Defendant's Supplemental Brief (Dkt. No. 65); the Government's Supplemental Brief (Dkt. No. 66); Defendant's Response to the Government's Supplemental Brief (Dkt. No. 68); and the Government's Response to Defendant's Supplemental Brief (Dkt. No. 67).[1] An evidentiary hearing was held on November 17, 2022. (Dkt. No. 63). For the reasons discussed below, the Court will deny Defendant's Motion.

---

[1] The Court ordered simultaneous supplemental briefing to clarify various legal issues. (Dkt. No. 57).

# I.    BACKGROUND[2]

Sebastian Soogrim was charged with two drug offenses stemming from law enforcement's discovery and seizure of marijuana on his property in early February 2022.[3] (Dkt. No. 14). The events leading to his arrest began in May 2021, when Crime Stoppers—a phoneline for police tips—received an anonymous tip that there was a "weed farm" with "at least 100 trees" in the yard of a property located behind the Police Athletic League ("PAL") building in Frederiksted. (Dkt. No. 59, Gov't Ex. 4). That tip was subsequently reviewed by Detective Moses President on January 23, 2022, who walked the PAL fence line with another officer the following day. (Dkt. No. 63 (President Tr.) at 25:12-18). While doing so, President observed some marijuana plants growing in the yard of a property he later identified as 59F Estate Whim. *Id.* at 26:22-28:4. Although 59F Estate Whim borders Soogrim's property at 58C Estate Whim, neither President nor his fellow officer saw any marijuana on Soogrim's property on that day. *Id.* at 24:5-6, 45:18-24.

Two days later, President and another officer conducted aerial surveillance of 59F Estate Whim—and, by extension, 58C Estate Whim—using a small airplane. *Id.* at 31:13-32:15. By using a camera with an "extended zoom" lens, President was able to observe over 100 marijuana plants spread across (what was later identified as) the two properties, and he subsequently determined that at least 50 of those plants were located on Soogrim's property. (Dkt. No. 44-2 at 5). A little over a week later, President sought and received a search warrant for Soogrim's property, based

---

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[3] Specifically, Soogrim was charged with one count of possessing marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and one count of maintaining drug-involved premises in violation of 21 U.S.C. § 856(a). (Dkt. No. 14 at 1-2).

principally on the information he obtained during the aerial search. *Id.* at 4-7. When he and over a dozen other officers executed the warrant three days later, they seized nearly 600 marijuana plants. (Dkt. No. 63 (President Tr.) at 71:4-8). Soogrim was home at the time, and he made a statement to another officer, Sergeant Aldemar Santos. (Dkt. No. 63 (Santos Tr.) at 71:2-3). As recounted by Santos, "I [Santos] asked [Soogrim] who the marijuana plants belong to. And he said, 'They are mine.'"[4] Later, while being interviewed by Santos and President at the police station, Soogrim made additional statements regarding ownership of the marijuana. *Id.* at 75:7-9 ("I [Santos] asked [Soogrim], you know, was it his marijuana? And he said yes, it was to pay bills and it was for personal consumption.").

Soogrim now moves—under the Fourth Amendment—to suppress the marijuana that police recovered on his property, arguing that it is the poisoned fruit of unlawful aerial surveillance and that the search warrant the police executed at his property was issued without probable cause.[5] (Dkt. No. 44 at 6-7). He also moves—under the Fifth Amendment—to suppress the statement he made at his property.[6] *Id.* at 7-10. As discussed below, Soogrim's Fourth Amendment challenge ultimately centers on President's use of a camera with an "extended zoom" lens in conducting the

---

[4] The transcript of the hearing contains either a printer's or speaker's error here, reflecting that Santos testified that Soogrim stated, "They are mines." *Id.* The Court omits this error throughout.

[5] Although Soogrim initially challenged—under the Fourth Amendment—the particularity of the search warrant that police executed at his property (Dkt. No. 44 at 3-5), he withdrew this challenge at the evidentiary hearing. (Dkt. No. 63 (Hr'g Tr.) at 139:5-9). Relatedly, while the Court understood Soogrim to withdraw, at the evidentiary hearing, his Fourth Amendment challenge insofar as it relied on the anonymous tip (*see* Dkt. No. 44 at 6; Dkt. No. 63 (Hr'g Tr.) at 140:21-25), he has continued to pursue this argument in both his Supplemental Brief (Dkt. No. 65 at 1-4) and Supplemental Response (Dkt. No. 68 at 1-2). As the Government has likewise addressed the issue in its Supplemental Brief (Dkt. No. 66 at 1-3), the Court factors this issue into its Fourth Amendment analysis below.

[6] Although Soogrim initially challenged—under the Fifth Amendment—the voluntariness of his statements at the police station (Dkt. No. 44 at 9-10), he withdrew this challenge at the evidentiary hearing. (Dkt. No. 63 (Hr'g Tr.) at 140:21-25; Dkt. No. 65 at 13 n.13).

aerial surveillance, while Soogrim's Fifth Amendment challenge ultimately turns on whether he was in custody when he made the statement to Santos regarding ownership of the marijuana. The Court finds that Soogrim's challenges lack merit.

## II.     FOURTH AMENDMENT CHALLENGE

### A.     Applicable Legal Principles

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. When the police search someone's property without proper justification they violate that constitutional protection. To remedy such violations, the Supreme Court adopted the exclusionary rule, under which evidence that police have unlawfully obtained may be "suppressed" at trial—that is, deemed inadmissible in the government's case-in-chief. *Weeks v. United States*, 232 U.S. 383, 292 (1914); *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The exclusionary rule "encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016).

For purposes of the Fourth Amendment, a search occurs when: (1) the government physically intrudes on a constitutionally protected area; or (2) invades an expectation of privacy that society recognizes as reasonable. *Florida v. Jardines*, 569 U.S. 1, 5 (2013). To determine whether police action qualifies as a search under the second criterion, courts engage in a two-part inquiry, asking: "[F]irst, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Katz v. United States*, 389 U.S. 347, 211 (1967) (Harlan, J., concurring). If an individual has manifested a subjective expectation of privacy in his property and his expectation

was objectively reasonable, then a search has occurred for Fourth Amendment purposes. *Id.* If either of these conditions does not obtain, no search has occurred. *Id.*

Based on this established legal standard, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). One's expectation of privacy is at its pinnacle in one's home. *See Lange v. California*, 141 S. Ct. 2011, 2022-23 (2021) ("Like our modern precedents, the common law afforded the home strong protection from government intrusion." (collecting cases)). Likewise, the curtilage of one's home—"the land immediately surrounding and associated with the home," which "extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life'"—"warrants the Fourth Amendment protections that attach to the home." *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). "Conversely . . . no expectation of privacy legitimately attaches to open fields"—those areas of one's property beyond the curtilage. *Oliver*, 466 U.S. at 180; *see also id.* at 179 ("In contrast [to curtilage], open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance.").

Once a defendant has established that a search was conducted, and that it was conducted without a warrant, the burden shifts to the government to show that the search was nonetheless reasonable because it was conducted pursuant to an exception to the warrant requirement. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *Minnesota v. Dickerson,* 508 U.S. 366 (1993)**.** If the government fails to meet its burden, then evidence recovered during or because of that search will be suppressed unless the government can show that an exception to the exclusionary rule applies. *Hudson v. Michigan*, 547 U.S. 586, 591-93 (2006).

**B.    Discussion**

Soogrim seeks to suppress the marijuana that officers recovered from his property, arguing that it is the poisoned fruit of President's warrantless aerial surveillance of his property, which Soogrim argues constituted an unlawful search. (Dkt. No. 65 at 4-14). Relatedly, Soogrim contends that the anonymous Crime Stoppers tip that spurred President's investigation was stale and insufficient to establish probable cause for the search warrant police executed at his property.[7] *Id.* at 1-4. The Government argues that President's aerial surveillance does not qualify as a search within the meaning of the Fourth Amendment and that the search warrant issued on probable cause. (Dkt. No. 66 at 1-6).

For the reasons discussed below, the Court finds that President's aerial surveillance of Soogrim's property did not constitute a search within the meaning of the Fourth Amendment and, as such, was not unlawful. By corollary, the question of whether the tip was stale or sufficient to establish probable cause alone is immaterial: President's affidavit was based principally on his observations during and following his aerial surveillance of Soogrim's property, and these observations clearly suffice to establish probable cause. *See, e.g., United States v. Patterson*, No. 19-CR-00016, 2020 WL 1151061, at *4 (D.V.I. Mar. 9, 2020) (finding that "aerial photographs" of the defendants' property, analysis of which revealed a marijuana "grow house" on the property, supplied probable cause for search warrant).

**1.    Subjective Expectation of Privacy**

It is undisputed that President did not have a warrant when he aerially surveilled Soogrim's property. (Dkt. No. 63 (President Tr.) at 49:23-24). For the Court to conclude that President's

---

[7] In other words, Soogrim argues that should the Court find that President's aerial surveillance was unlawful, it must also find that the search warrant issued without probable cause *because* the tip alone does not establish probable cause.

warrantless aerial surveillance was unreasonable, it must first find that it constituted a search within the meaning of the Fourth Amendment—that is, the Court must find that Soogrim manifested a subjective expectation of privacy with respect to his property and that his expectation was objectively reasonable. *Katz*, 389 U.S. at 211. Because the Government does not argue that any exception to either the warrant requirement or the exclusionary rule is applicable, if President's aerial surveillance constituted a search then the marijuana police recovered must be suppressed. *Strieff*, 579 U.S. at 237.

The Court begins with the question of Soogrim's subjective expectation of privacy. "The subjective prong requires a court to determine whether the defendant, by his conduct, has exhibited an actual expectation of privacy." *United States v. Cortez-Dutrieville*, 743 F.3d 881, 884 (3d Cir. 2014) (internal citation and quotation marks omitted). To establish this prong, a defendant need only show that he "took normal precautions to maintain his privacy." *United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014).

The Government argues that Soogrim did not demonstrate a subjective expectation of privacy in his property. Dkt. No. 66 at 5-6. Its principal argument in support of this position is that this case is distinguishable from *United States v. Somme*—a recent case in which this Court found that two defendants exhibited a subjective expectation of privacy with respect to residential properties on which they grew marijuana. *Id.* (citing No. 19-CR-00018, 2022 WL 4365856 (D.V.I. Sept. 20, 2022)). Specifically, the Government contends that in contrast to the properties at issue in *Somme*, which were in a "secluded, rural area, and not surrounded by any other houses," Soogrim's property is "adjacent [both] to other homes and . . . to public property owned by the government of the Virgin Islands." (Dkt. No. 66 at 5). It is true that Soogrim's property is distinguishable from the properties at issue in *Somme*. However, the Government's argument is

unpersuasive because the Court's *Somme* opinion does not hold that a defendant's property *must* be located in a secluded, rural area and not surrounded by other homes for a defendant to have a subjective expectation of privacy with respect to that property. Rather, the Court held only that seclusion in a rural area—in conjunction with other factors listed in the *Somme* opinion—is sufficient to demonstrate such an expectation. *Somme*, 2022 WL 4365856 at *11.

The Government's argument is also unpersuasive because the record demonstrates that Soogrim took normal precautions to maintain his privacy. Soogrim lives at the end of a dead-end road, and his property is fenced, gated, and largely surrounded by tall bushes. (Dkt. No. 59, Gov't Exs. 2 and 3; Dkt. No. 63 (President Tr.) at 25:9-11, 55:7-9). He also covered much of his marijuana operation with tarps, roofing, and a large piece of wood. (Dkt. No. 57, Gov't Ex. 2; *see* Dkt. No. 63 (Argument Tr.) at 103:10-104:14 (accurately characterizing Government Exhibit 2)). These precautions ensured that, from a ground view perspective, the plants were not visible. (Dkt. No. 63 (President Tr.) at 16:3-6). They also evince that Soogrim maintained a subjective expectation of privacy with respect to the area of the marijuana grow operation. *See California v. Ciraolo*, 476 U.S. 207, 211 (1986) ("It can reasonably be assumed that the 10-foot fence was placed to conceal the marijuana crop from at least street-level views. So far as the normal sidewalk traffic was concerned, this fence served that purpose[.]"); *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (erection of fences around the backyard manifested a subjective expectation of privacy). Nor does the fact that Soogrim's property was visible from the air negate his subjective expectation of privacy. As Justice Connor observed in her concurrence in *Florida v. Riley*:

> [E]ven individuals who have taken effective precautions to ensure against ground-level observations cannot block off all conceivable aerial views of their outdoor patios and yards without entirely giving up their enjoyment of those areas. To require individuals to completely cover and enclose their

> curtilage is to demand more than the precautions customarily taken by those seeking privacy.

488 U.S. 445, 454 (1989) (O'Connor, J., concurring) (internal quotation marks and citation omitted)); *see also Somme*, 2022 WL 4365856 at *11 (collecting similar cases).

In view of the foregoing, the Court finds that Soogrim has adequately demonstrated his subjective intent to maintain his privacy in the area of his property occupied by his marijuana grow operation.

## 2.   Objective Expectation of Privacy

As Soogrim has demonstrated a subjective expectation of privacy, his Fourth Amendment challenge therefore hinges on the objective prong of the *Katz* test. To place the parties' respective arguments in the relevant legal context, the Court begins its analysis of this prong with the three aerial surveillance cases decided by the Supreme Court.

In the first of these cases, *California v. Ciraolo*, the Supreme Court addressed whether it was objectively reasonable for a defendant to expect that the government would not aerially surveil his residential property using an airplane from an altitude of 1000 feet. 476 U.S. at 214. The Supreme Court held that it was not objectively reasonable, basing this conclusion on two principal considerations. *Id.* First, the Supreme Court determined that the government aerially surveilled Ciraolo's property from navigable airspace in which it had the right to be. *Id.* at 213 ("[T]he mere fact that an individual has taken measures to restrict some views of his activities does not preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible."); *see also* 14 C.F.R. § 91-119(b) and (c) (regulations on minimum safe altitudes promulgated by the Federal Aviation Administration, providing that fixed-wing aircraft must fly at an altitude of not less than 1,000 feet over congested areas and 500 feet over less than congested areas). Explaining its emphasis on this factor, the Supreme Court analogized

9

aerial surveillance to ground surveillance, observing that the "Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *Id.* at 213; *see also id.* at 213-14 (observing "any member of the public flying in this airspace who glanced down could have seen everything that these officers observed"). Second, the Supreme Court reasoned that the government aerially surveilled Ciraolo's property in a "physically nonintrusive manner." *Id.* at 208. In addition to these two considerations, the *Ciraolo* court also highlighted that the marijuana the government observed on Ciraolo's property was observable to the naked eye, *id.* at 207-08, and the routine nature of aerial flights, *id.* at 215.

Next, in *Dow Chemical v. United States*, the Supreme Court addressed whether it was objectively reasonable for a defendant to expect that the government would not aerially surveil a commercial property using an airplane from altitudes varying as low as 1200 feet while utilizing a camera with enhanced magnification that "saw a great deal more than the human eye could ever see." 476 U.S. 227, 230, 239 (1986). The Supreme Court held that it was not objectively reasonable. *Id.* In reaching this conclusion, the Supreme Court highlighted —as it had in *Ciraolo*— that the government aerially surveilled the property at issue from navigable airspace. *Id.* at 229. It also reasoned that as commercial property, Dow's property was better analogized to "open fields" than curtilage, meaning that Dow enjoyed fewer Fourth Amendment protections with regard to its property than a residential homeowner. *Id.* 237-39; *see Oliver*, 466 U.S. at 178 ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home [*i.e.,* the curtilage]."). Relatedly, the *Dow Chemical* court emphasized that, while the relevant photographs "undoubtedly" gave the government "more detailed information than naked-eye views," the government employed a "a conventional, albeit

precise, commercial camera" rather than "some unique sensory device," meaning the photographs at issue remained "limited to an outline of the facility's buildings and equipment" and were "not so revealing of intimate details as to raise constitutional concerns." *Id.* at 238.

Finally, in *Florida v. Riley*, the Supreme Court addressed whether it was objectively reasonable for a defendant to expect that the government would not aerially surveil his residential property using a helicopter from an altitude of 400 feet. 488 U.S. at 448. A plurality of the Supreme Court held that it was not objectively reasonable. *Id.* Again, the Supreme Court emphasized—as it had in *Ciraolo* and *Dow Chemical*—that the government aerially surveilled the defendant's property from navigable airspace. *Id.* at 450-51; *see also id.* at 451 (noting "helicopters are not bound by the lower limits of the navigable airspace allowed to other aircraft" and "may be operated at less than the minimums for fixed-wing-aircraft 'if the operation is conducted without hazard to persons or property on the surface.'" (quoting 14 CFR § 91.79)). The *Riley* court—like the *Ciraolo* court—also highlighted that the observations at issue were made by the naked eye. *Id.* at 448 ("The Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the naked eye." (quoting *Ciraolo*, 476 U.S. at 215)).

In addition to the Supreme Court's treatment of sense-enhancing technology in *Dow Chemical*, the Justices have also addressed the use of such technology outside the aerial surveillance context. In *Kyllo v. United States*, the Supreme Court held that it was objectively reasonable for a defendant to expect that the government would not surveil the interior of his home from a public street using thermal imaging. 533 U.S. 27, 34 (2001). In reaching this conclusion, the *Kyllo* court—like the *Dow Chemical* court—focused on the commercial availability of the sense-enhancing technology at issue. *Id.* at 35. Specifically, the *Kyllo* court held that the

government's search of *Kyllo*'s home constituted a search for purposes of the Fourth Amendment because, first, the thermal imaging device that the government had employed was "not in general public use," *id.* at 35; and second, that the information that the government obtained using this generally unavailable technology could not have been otherwise obtained without physical intrusion into Kyllo's home. *Id.* at 34, 40.

With the foregoing in mind, the Court now turns to the facts of this case. The record here establishes the following:

> ➢ That President aerially surveilled Soogrim's curtilage (Dkt. No. 63 (President Tr.) at 42:24-43:16);
>
> ➢ That President did so from approximately 2000 feet, *i.e.*, from navigable airspace, *id.* at 16:14-17:4;
>
> ➢ That President conducted his surveillance using a camera with enhanced magnification, *id.* at 38:12-39:12, without which he could not identify the marijuana on Soogrim's property, *id.* at 66:23-67:4; and
>
> ➢ That the camera and zoom lens President used are generally available to the public, *id.* at 65:8-66:2.

Soogrim's Fourth Amendment challenge, then, squarely presents a question left open by *Ciraolo*, *Dow Chemical, Riley*, and *Kyllo*: Whether it is objectively reasonable for a defendant to expect that the government will not aerially surveil his curtilage using image-enhancing technology in general public use from a lawful vantage point, *i.e.,* navigable airspace.

The Government argues that Soogrim's expectation was objectively unreasonable because, notwithstanding President's use of image-enhancing technology, President observed no "intimate details connect[ed] with the use of the home or curtilage[.]" (Dkt. No. 66 at 5 (quoting *Riley*, 488 U.S. at 452)). Soogrim, by contrast, urges the Court to adopt a bright line rule to the effect that aerial surveillance of one's curtilage violates an objectively reasonable expectation of privacy

when it involves "anything other than naked eye observation." (Dkt. No. 65 at 12). He makes three principal arguments in support of this contention.

First, Soogrim stresses that the Fourth Amendment must "be construed in the light of what was deemed an unreasonable search and seizure *when it was adopted,*" *id.* at 9 (quoting *Kyllo*, 533 U.S. at 36) (emphasis added by Soogrim), and argues that cameras—and specifically cameras with magnification technology—"cannot be what the Fourth Amendment would deem a reasonable search" because the camera was invented after the Bill of Rights was passed, *id.* at 11. Second, Soogrim stresses that both *Ciraolo* and *Riley* addressed only naked eye observations, and that the Supreme Court highlighted this factor in both cases and noted that evolving technology could conceivably alter its conclusions. *Id.* at 7, 11. Third, Soogrim maintains that the curtilage at issue in this case is entitled to greater protections than the "open fields" at issue in *Dow Chemical*, and argues that the Supreme Court's sanction of sense-enhancing technology in aerial surveillance in that case should not be understood to control the outcome here. *Id.* at 7-9, 12.

The Court places no weight on the first of Soogrim's arguments. It is true that the Supreme Court has looked to historical understandings of the Fourth Amendment and has reaffirmed this mode of analysis in the recent past. *See, e.g., Torres v. Madrid*, 141 S.Ct. 989, 996 (2021). At the same time, however, the Supreme Court has noted that "no single rubric definitively resolves which expectations of privacy are entitled to protection." *Carpenter v. United States*, 138 S. Ct. 2206, 2214-15 (2018). The Supreme Court has also made explicit that it takes the prohibition on the use of technology that is not in general public use to "assure[] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo*, 533 U.S. at 34. The Court is therefore unpersuaded that the mere fact that technology post-dates the Fourth Amendment compels or even implies that surveillance utilizing the same is unreasonable.

Such logic would not only be inconsistent with *Ciraolo* and its progeny—indeed, the Wright brothers' first flight post-dates the passage of the Bill of Rights by over a century—but with the overwhelming weight of authority sanctioning the use of cameras and other technology invented after 1791. *See, e.g., United States v. Knotts,* 460 U.S. 276 (1983) (beeper monitors); *Smith v. Maryland*, 442 U.S. 735, 742 (1979) (pen registers).

Soogrim is, however, correct to observe—in his second argument—that the Supreme Court noted that the observations at issue in *Ciraolo* and *Riley* were made with the naked eye and that the evolving technology might alter its conclusions. *Ciraolo* 476 U.S. at 215; *Riley*, 488 U.S. at 456; *see also Kyllo*, 533 U.S. at 35-36 (discussing the Court's reticence to "leave the homeowner at the mercy of advancing technology"); *United States v. Karo*, 468 U.S. 705, 712 (1984) ("It is the exploitation of technological advances that implicates the Fourth Amendment."). Soogrim is also correct to stress—in his third argument—that his residential property is distinguishable from the commercial property in *Dow Chemical*. These arguments go to the heart of the question left open by the Supreme Court: Whether it is objectively reasonable for a defendant to expect that the government will not aerially surveil his curtilage using image-enhancing technology in general public use from a lawful vantage point.

Federal courts have provided limited guidance on this question. The Ninth Circuit has addressed similar—although not identical—circumstances in three cases. In *United States v. Allen*, the Ninth Circuit held that aerial surveillance using a 70-230 mm. zoom lens—instead of "the standard 50 mm. lens"—did not constitute a search notwithstanding that "a lens of normal focal length would not have disclosed the objects seen in the blow-ups of the photos." 675 F.2d 1373, 1381-82 (9th Cir. 1980). Next, in *United States v. Cervantes-Garcia*, the Ninth Circuit held that "aerial surveillance with gyroscopic binoculars of ordinary fourteen power" did not constitute a

search. 940 F.2d 1536 (9th Cir. 1991). Then, in *United States v. Van Damme*, the Ninth Circuit held that aerial surveillance using a camera with a 600 mm. zoom lens did not constitute a search. 48 F.3d 461, 463 (9th Cir. 1995).

Notably, in each of these three cases the Ninth Circuit stressed that the zoom technology at issue was widely available commercially, thereby underscoring *Dow Chemical*'s focus on this factor in the aerial surveillance context. *See*, *e.g., Van Damme*, 48 F.3d at 463 (noting that *Dow Chemical* distinguished between "conventional equipment commonly available to the public and without the ability to penetrate walls or windows, and highly sophisticated surveillance equipment not generally available to the public"); *see also Kyllo*, 533 U.S. at 34 (stressing import of this factor outside the aerial surveillance context).[8] Also notable is that the Ninth Circuit appears to have placed little emphasis on whether the aerial surveillance at issue took place within the curtilage. While *Cervantes-Garcia* concerned a search of open fields, the Ninth Circuit neglected to specify whether the searches in *Allen* and *Van Damme* involved aerial observations of curtilage or open fields.

---

[8] State courts have likewise stressed the commercial availability of technology in the aerial surveillance context. *See, e.g., Rook v. State*, 679 N.E.2d 997 (Ind. Ct. App. 1997) (holding that surveillance of open fields using binoculars was not a search under state constitution and noting that "nothing in the record indicates that the binoculars were . . . extremely powerful or generally unavailable"); *People v. Oynes*, 920 P.2d 880, 883 (Colo. Ct. App. 1996) (holding that surveillance of interior of residence using binoculars of unspecified strength" was not a search under state constitution and noting that record did not establish binoculars were "extraordinarily powerful"); *State v. Lange,* 158 Wis. 2d 609, 622-23 (Ct. App. 1990) (holding that aerial surveillance of curtilage using binoculars and cameras with zoom lenses was not a search under Fourth Amendment and expressly limiting holding to "approval of the use of standard binoculars and cameras equipped with generally available standard and zoom lenses"); *State v. Vogel,* 428 N.W.2d 272, 275 (S.D.1988) (holding that surveillance using camera with a zoom lens to view interior of residence was not a search under the Fourth Amendment and noting that camera was not "special equipment not generally in use"); *State v. Stachler*, 58 Haw. 412, 421 (1977) (holding that aerial surveillance of open fields using binoculars was not a search under state constitution and noting that "[i]f the lower court had found . . . that highly sophisticated viewing devices had been employed, we might well decide differently").

Whether the Supreme Court places emphasis on the location of the search—*i.e.,* on the curtilage or not—is not entirely clear. On the one hand, *Ciraolo* and *Riley* appear to have assessed little if any weight to the fact that the observations at issue were made within the curtilage. *See State v. Bryant*, 183 Vt. 335, 366 (2008) (observing that "[t]he *Ciraolo* Court gave no weight to the fact that the aerial surveillance targeted a home and its curtilage"). On the other hand, however, in *Dow Chemical* the Supreme Court noted that "it [was] important that [the area surveilled was] *not* an area immediately adjacent to a private home, where privacy expectations are most heightened." *Dow Chemical*, 476 U.S. at 237 n. 4 (emphasis in original). One might argue—as Justice Powell noted in his *Ciraolo* dissent—that there is some discrepancy here. *Ciraolo*, 476 U.S. at 219 (Powell, J., dissenting) (characterizing the majority opinion as "curiously at odds with [the Court's] purported reaffirmation of the curtilage doctrine [in] *Dow Chemical,*" which was decided the same day).

In any event, it appears to this Court that the Supreme Court has made explicit that the aerial observations with which it is concerned for Fourth Amendment purposes are those revealing "intimate details." *See Riley*, 488 U.S. at 452 ("As far as this record reveals, *no intimate details* connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind, dust, or threat of injury. In these circumstances, there was no violation of the Fourth Amendment." (emphasis added)); *Dow Chemical*, 476 U.S. at 238-39 ("It may well be, as the Government concedes, that surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public, such as satellite technology, might be constitutionally proscribed absent a warrant. But the photographs here are *not so revealing of intimate details* as to raise constitutional concerns. Although they undoubtedly give EPA more detailed information than naked-eye views, they remain limited to an outline of the facility's

16

buildings and equipment." (emphasis added)); *Ciraolo*, 476 U.S. at 215 n.3 (noting that the government correctly acknowledged "that '[a]erial observation of curtilage may become invasive, either due to physical intrusiveness or through modern technology which discloses to the senses *those intimate associations, objects or activities* otherwise imperceptible to police or fellow citizens.'" (emphasis added) (citation omitted)). These references suggest that the Court's concerns about technological advances in the aerial surveillance context are not directed toward observations of the curtilage in general, but to those observations which reveal intimate details.

In view of the foregoing, and as further discussed below, the Court is unpersuaded by Soogrim's argument that President's aerial surveillance of Soogrim's curtilage violated an objectively reasonable expectation of privacy because it involved "[something] other than naked eye observation." (Dkt. No. 65 at 12). Four considerations ultimately underlie the Court's conclusion.

First, *Ciraolo* and *Riley* stand only for the proposition that—provided other conditions are satisfied—police do *not* require a warrant to observe what is visible to the naked eye. It does not follow from this that police require a warrant where they observe more than what is available to the naked eye. Indeed, given that President observed Soogrim's property from a lawful vantage point, with no physical intrusion or disturbance, the Court concludes that he did not violate the tenants of *Ciraolo* and *Riley*, both of which also concerned observations of curtilage. *Ciraolo* 476 U.S. at 215; *Riley*, 488 U.S. at 456.

Second, the Court also concludes that President did not violate the tenants of *Kyllo*—which proscribes only the use of sense-enhancing technology that is not in public use, 533 U.S. at 35— because the camera and lens he employed were widely available commercially. (Dkt. No. 63 (President Tr.) at 65:8-66:2); *see also Knotts,* 460 U.S. at 282 ("Nothing in the Fourth Amendment

prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case.").

Third, President's aerial surveillance of Soogrim's property did not reveal intimate details connected with Soogrim's use of his home or curtilage. Instead, President's aerially surveillance of Soogrim's property was limited to little more than the "outline[s]" the Supreme Court explicitly contrasted to "intimate details" in *Dow Chemical*. *See Dow Chemical*, 476 U.S. at 239; Dkt. No. 59, Gov't Exs. 2 and 3 (photographs of property).

Finally, while the Supreme Court has noted that police activity that would otherwise be insufficient to qualify as a search may nonetheless constitute a search for purposes of the Fourth Amendment when it takes place over an extended period of time,[9] President aerially surveilled Soogrim's property for only a short period of time. (Dkt. No. 63 (President Tr.) at 37:7-24).

In sum, because President aerially surveilled Soogrim's property from navigable airspace and in a non-intrusive manner, because he used technology widely available to the general public, because his surveillance did not reveal intimate details, and because his surveillance was of limited duration, the Court concludes that Soogrim's expectation of privacy is not one society is willing to recognize as reasonable. Accordingly, no search cognizable under the Fourth Amendment occurred and Soogrim's Fourth Amendment challenge must therefore fail.

---

[9] *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring in the judgment) ("We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark."); *Carpenter*, 138 S. Ct. At 2217 n. 3 ("[W]e need not decide whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny, and if so, how long that period might be. It is sufficient for our purposes today to hold that accessing seven days of CSLI constitutes a Fourth Amendment search."); *see generally* Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 MICH. L. REV. 311, 333 (2012) (discussing relevant body of case law)).

## III.   FIFTH AMENDMENT CHALLENEGE

### A.   Applicable Legal Principles

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The necessary "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised, prior to questioning, that:

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479. The Supreme Court has reasoned that these rights are necessary because "interrogation in certain custodial circumstances is inherently coercive," *New York v. Quarles*, 467 U.S. 649, 654 (1984), and *Miranda* warnings are therefore required when a suspect is both in custody and subject to interrogation by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974). "[I]n the absence of one or the other [condition], *Miranda* is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F. Supp. 391, 393-94 (D.V.I. 1997).

Custody, for purposes of *Miranda*, turns on whether "there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Thus, when an individual has not been openly arrested, "the relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012). In other words, "something must be said or done by

19

the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so." *Steigler,* 496 F.2d at 799. This determination is "objective, 'based on how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 227 (3d Cir. 2003) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). As such, courts must ask "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004)) (emphasis in original). Factors bearing upon this analysis include, without limitation:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359–60 (3d Cir. 2006) (the "*Willaman* factors") (internal citations omitted); *see also Jacobs*, 431 F.3d at 105 (noting courts should also consider "the information known by the [interrogating] officer concerning the suspect's culpability," and "whether the officer revealed his belief that the suspect was guilty.").

Interrogation, for purposes of *Miranda*, encompasses not only "express questioning," but also its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Thus, interrogation includes "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 Fed. App'x 119, 126 (3d Cir. 2012). Such conduct includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the

20

police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-01.

**B.  Discussion**

Police executed the search warrant for Soogrim's property in the early morning hours of February 7, 2022. (Dkt. No. 63 (Santos Tr.) at 68:24-69:4). At the time, Soogrim was home with his wife and a third person. (Dkt. No. 63 (President Tr.) at 57:18-25). The search began when an entry team of between five to seven uniformed officers wearing bullet proof vests opened the front gate of the property and knocked on the front door. *Id.* at 55:7-56:2, 57:5-7. The entry team was armed, with their "handguns and rifles" unholstered. *Id.* at 59:12-22. The entry team secured Soogrim and his fellow occupants in the yard, and then cleared the house. *Id.* at 55:5-7, 58:1-6. While this was occurring, a second team of between five and eight armed and uniformed officers secured the "perimeter" of the property. *Id.* at 56:14-57:3.

Santos arrived after Soogrim and his fellow occupants were already in the yard. (Dkt. No. 63 (Santos Tr.) at 69:8-11). He approached Soogrim, identified himself, and handed Soogrim the search warrant. *Id.* at 69:16-70:5. A forensics team then arrived, consisting of at least two officers. *Id.* at 70:6-10. After they and other officers had "collected all of the evidence," Santos then engaged in the interaction with Soogrim with which Soogrim takes issue. *Id.* at 70:15-19. On direct examination, Santos testified that his interaction with Soogrim unfolded as follows:

> I [Santos] asked [Soogrim], "Do you understand your rights?" He nodded his head up and down and [said] "yes." I told him that "you don't have to say anything to me." . . . [H]e acknowledged by nodding his head up and down and saying "yes." And I told him that he doesn't have to answer any of my questions. Again, he understood by nodding his head up and down and saying "yes."
> Then I asked him who the marijuana plants belong to. And he said, "They are mine."

*Id.* at 70:20-71:3. Cross examination shed additional light on the interaction:

> **Q.** [Y]ou [Santos] asked [Soogrim] if he understood his rights?
>
> **A.** Yes.
>
> **Q.** And you advised him that he didn't have to talk to you?
>
> **A.** That's correct.
>
> **Q.** And you advised him that he didn't have to answer your questions?
>
> **A.** That's correct.
>
> **Q.** Did you present him with any written documentations to memorialize that?
>
> **A.** At the time, no, because I didn't have it available to me.
>
> **Q.** And he didn't sign anything at that point in time?
>
> **A.** No, he did not.
>
> **Q.** Did you advise him that he was entitled to counsel?
>
> **A.** No, I didn't say that to him.
>
> **Q.** But you inquired of him who the marijuana belonged to?
>
> **A.** Yes, I did.
>
> **Q.** And you indicated that Mr. Soogrim said the marijuana was his?
>
> **A.** That's correct.
>
> **Q.** And there was no further conversations?
>
> **A.** No.

*Id.* at 77:19-78:18.

Soogrim contends that Santos's questioning amounted to interrogation, that he was in custody when he answered, and that Santos had not effectively *Mirandized* him before he answered. (Dkt. No. 65 at 16-20). The Government concedes that Santos's questioning amounted to interrogation. (Dkt. No. 66 at 7-9; Dkt. No. 67 at 1). It disputes, however, that Soogrim was in custody for purposes of *Miranda*, principally relying on the facts that the questioning took place at Soogrim's home, and that Soogrim had not yet been placed under formal arrest, "handcuffed, frisked, or told he could not leave." (Dkt. No. 66 at 8-9). The Government also argues that even if Soogrim was in custody, Santos timely and effectively *Mirandized* him before he confessed to owning the marijuana. *Id.* at 9-10.

As an initial matter, the Court finds—as the Government has conceded—that Santos's express questioning of Soogrim amounts to interrogation. There can be no serious dispute that asking a suspect to whom drugs belong constitutes conduct "intentionally designed to evoke a confession," *Bonner*, 469 Fed. App'x at 126, or which is "reasonably likely to elicit an incriminating response," *Innis*, 446 U.S. at 301. *See, e.g., United States v. Almonte*, 348 F. Supp. 3d 402, 406-08 (E.D. Pa. 2018) (finding the defendant was subject to interrogation where police asked him whether illegal drugs police had discovered belonged to him); *United States v. Young*, No. 15-CR-60328, 2016 WL 11431025, at *5 (S.D. Fla. Nov. 8, 2016) (same); *United States v. Avila*, No. 01-CR-01131, 2002 WL 35650128, at *6 (D.N.M. Jan. 31, 2002) (same); *United States v. Green*, 776 F. Supp. 565, 568 (D.D.C. 1991) (same).

The custody issue is, however, disputed. The first *Willaman* factor asks whether the officers told the suspect he was under arrest or free to leave. *Willaman*, 437 F.3d at 359. The Third Circuit has observed that where a suspect is "not told anything regarding [his] arrest, pro or con," the first *Willaman* factor "falls somewhat in [his] favor." *Jacobs*, 431 F.3d at 106. Here, Santos did not inform Soogrim that he was free to leave or that he was not under arrest before commencing the interrogation. However, before interrogating Soogrim, Santos informed Soogrim that Soogrim did not have to answer Santos' questions and that Soogrim did not have to say anything , both of which Soogrim acknowledged by "nodding his head up and down and saying 'yes.'" (Dkt. No. 63 (Santos Tr.) at 70:20-71:3). Under the particular circumstances here, the Court finds that this factor is neutral.

The second *Willaman* factor—the location or physical surroundings of the interrogation— weighs in favor of the Government because Soogrim was interrogated at his own home. *See United States v. Killingsworth*, 118 F. App'x 649, 651-52 (3d Cir. 2004) ("[A]n interrogation in familiar

surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody.'" (citation and internal quotation marks omitted)). Likewise, the third *Willaman* factor—the length of the interrogation—weighs in favor of the Government because Santos interrogated Soogrim for only a very brief period of time. Based on the record before the Court, Santos asked Soogrim only two questions: "Do you understand your rights?" and "who the marijuana plants belong to[.]" (Dkt. No. 63 (Santos Tr.) at 70:20-71:3); *see United States v. Henry*, No. 2017-CR-00001, 2018 WL 6840149, at *6 (D.V.I. Dec. 31, 2018) (finding that this factor did not weigh in favor of custody where the defendant was interviewed for "a little under two hours" because "courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial" (quoting *Killingsworth*, 118 F. App'x at 651-52 (collecting cases)). The fifth *Willaman* factor—whether the suspect voluntarily submitted to questioning—also weighs in favor of the Government because Santos told Soogrim he was not required to answer any questions or say anything to Santos and Soogrim acknowledged Santos' statements to this effect before speaking with Santos. (Dkt. No. 63 (Santos Tr.) at 70:20-71:3).

Conversely, the considerations noted in *Jacobs*—namely, "the information known by the [interrogating] officer concerning the suspect's culpability," and "whether the officer revealed his belief that the suspect was guilty," 431 F.3d at 105—weigh in favor of Soogrim because Santos questioned Soogrim only after police had discovered hundreds of marijuana plants and "collected all of the evidence." (Dkt. No. 63 (Santos Tr.) at 70:15-19). Under such circumstances, Santos had considerable information regarding Soogrim's culpability and Soogrim undoubtedly knew that Santos believed him to be guilty, as would any reasonable person in his circumstances. *See Stansbury v. California*, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.").

24

This leaves the fourth *Willaman* factor—whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement. *Willaman*, 437 F.3d at 360. In his written submission, Soogrim emphasizes the number of officers present at his property, the fact that many of these officers were armed and had weapons drawn, and the fact that the officers ordered him out of his home. (Dkt. No. 65 at 16-17). However, the evidence does not reflect that Santos—the officer who interrogated Soogrim—was armed; Soogrim was not physically restrained in any way; and the very brief conversation between Santos and Soogrim appeared cordial. (*See* Dkt. No. 63 (Santos Tr.) at 71:12-16 (explaining Soogrim was placed under arrest after he was interrogated by Santos); *id.* at 76:15-16 ("He was not handcuffed")). The evidence further reflects that the armed officers who drew their weapons were part of the entry team that removed Soogrim from his home to his yard, but that Santos did not arrive at the property until after Soogrim was already in the yard. *Id.* at 69:8-11. Further, as noted above, the interrogation itself did not occur until after the forensics team had "collected all of the evidence," which followed the discovery of hundreds of marijuana plants. *Id.* at 70:15-17. Thus, the Court concludes that the evidence leads to a reasonable inference that the drawing of weapons was far removed from the actual interrogation. Based on the totality of the circumstances, the Court concludes that the fourth *Willaman* factor favors the Government.

In view of the fact that four *Willaman* factors favor the Government, one *Willaman* factor is neutral, and the *Jacobs* factors favor Soogrim, the Court concludes that Soogrim was not in custody at the time Santos interrogated him at his residence. *See United States v. King*, 604 F.3d 125 (3d Cir. 2010) (concluding the defendant was not in custody where first, fourth, and fifth

*Willaman* factors favored the government while second and third factors favored the defendant).[10]

Accordingly, Santos was not required to provide Soogrim with *Miranda* warnings prior to eliciting

the statement, and therefore, the Court will not suppress Soogrim's statement on this basis.

Soogrim also argues that his statement was involuntary even if it was not taken in violation

of his *Miranda* rights (Dkt. No. 44 at 9-10). *See Dickerson v. United States*, 530 U.S. 428, 433

(2000) (holding a defendant's statement must be voluntary to be admissible at trial); *United States*

*v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (holding that even a non-custodial statement may be

involuntary). "[A] statement is involuntary when the suspect's will was overborne in such a way

as to render his confession the product of coercion." *United States v. Latz*, 162 Fed.Appx. 113, 118

---

[10] Because the Court concludes that Soogrim was not in custody, it does not formally reach the Government's alternative argument to the effect that, even if Soogrim was in custody, Santos nonetheless timely provided Soogrim with adequate *Miranda* warnings. (Dkt. No. 66 at 9). The Court notes, however, that the Government's argument is without merit. It is clear that Santos did not timely advise Soogrim of his rights to have counsel appointed and present for questioning. (Dkt. No. 143 (Santos Tr.) at 78:9-10 (Q. "Did you advise [Soogrim] that he was entitled to counsel?" A. "No, I didn't say that to him.")). The Government errs in suggesting that *United States v. Warren*, 642 F.3d 182 (3d Cir. 2011)—and the Third Circuit's discussion, in that opinion, of *Florida v. Powell*, 559 U.S. 50 (2010), *Duckworth v. Eagan*, 492 U.S. 195 (1989), and *United States v. Prysock*, 453 U.S. 355 (1981) (*per curiam*)—suggest that the warnings Santos provided Soogrim were sufficient insofar as these cases collectively stand for the proposition that police are not required to recite the warnings verbatim. *See Prysock*, 453 U.S. at 359 ("*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures."). While *Warren*, *Powell*, *Prysock* and *Duckworth* all concerned the same warnings at issue here—those related to right to counsel—and while the warnings at issue in these cases passed muster, all four holdings were premised on the fact that *some* version of the warnings had been provided. In other words, the four cases address whether particular phraseologies of the *Miranda* warnings improperly conveyed those rights, not scenarios where—as here—no warnings regarding the right to counsel were provided at all. *Powell*, 559 U.S. at 62; *Prysock*, 453 U.S. at 358-59; *Duckworth*, 492 U.S. at 203; *Warren*, 642 F.3d at 186. *Miranda* itself requires that police must provide a "fully effective equivalent" of the *Miranda* warnings where they do not recite the warnings verbatim. 384 U.S. at 476. The absence of any equivalent right to counsel warning whatsoever does not satisfy this standard. *See Powell*, 559 U.S. at 60 ("[It is] 'an absolute prerequisite to interrogation,' that an individual held for questioning 'must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation.'" (quoting *Miranda*, 384 U.S. at 471); *see also id.* at 62 (highlighting that "officers did not *entirely omit* any information *Miranda* required them to impart" (internal citation and quotation marks omitted) (emphasis added)).

(3d Cir.2005) (quoting *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir.2002)) (quotations omitted). "A necessary predicate to a finding of involuntariness is coercive police activity. Further, there must be some causal connection between the police conduct and the confession." *Jacobs*, 431 F.3d at 108 (internal citation omitted). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." *Id.* at 109.

Here, the totality of the circumstances suggests that Soogrim's statements were voluntary. Soogrim was not restrained or handcuffed. *See United States v. Gonsalves*, No. 19-CR-00011, 2020 WL 1170217, at *9 (D.V.I. Mar. 10, 2020) (finding that the defendant's statements were voluntary despite the defendant being handcuffed and the presence of five or six officers). He was cooperative throughout Santos' questioning. *See United States v. Vidal*, 85 F. App'x 858, 863 (3d Cir. 2004) (concluding that a defendant was "not subject to much less overcome by coercive tactics [where] he appeared to be calm and was cooperative throughout the questioning...."). He was not subject to repeated or prolonged questioning. *Cf. United States v. Clark*, No. 18-CR-00009, 2019 WL 3456813, at *12 (D.V.I. July 30, 2019). There is nothing to suggest that Soogrim's age, education, or intelligence would have impacted the voluntariness of his statements. *See United States v. Phillip*, No. 19-CR-00001, 2020 WL 1102481, at *12 (D.V.I. Mar. 7, 2020). Finally, Soogrim was specifically informed that he did not have to answer any questions. (Dkt. No. 63 (Santos Tr.) at 70:20-71:3).

Under the circumstances, the Court finds that the Government has met its burden to establish that Soogrim's statement was voluntary. Accordingly, Soogrim's claim that his statement was involuntary fails.

## IV.    CONCLUSION

For the reasons discussed herein, Soogrim's Motion to Suppress will be denied.

An appropriate Order accompanies this Memorandum Opinion.

Date:   May 1, 2023                                    _____/s/_____
                                                              WILMA A. LEWIS
                                                               District Judge